**James R. SMITH, M.D.; Richard A. Knecht, M.D.; Thomas G. Depuydt, M.D.; Bradford S. Foster, M.D.; and Clark E. Taylor, D.O., Plaintiffs,**

v.

**NORTHERN MICHIGAN HOSPITALS, INC., a Michigan nonprofit corporation and Burns Clinic Medical Center, P.C., a Michigan professional corporation, Defendants.**

No. G79–182.

United States District Court,
W. D. Michigan, S. D.

July 15, 1981.

---

John C. Buchanan of Cholette, Perkins & Buchanan, Grand Rapids, Mich., Grady Avant, Jr. of Long, Preston, Kinnaird & Avant, Detroit Mich., for plaintiffs.

Gregory L. Curtner of Miller, Canfield, Paddock & Stone, Detroit, Mich., for defendant Burns Medical Center.

Derek I. Meier of Dykema, Gossett, Spencer, Goodnow & Trigg, Detroit Mich., for defendant Northern Michigan Hospitals.

## OPINION

ENSLEN, District Judge.

Plaintiffs, all physicians licensed by the State of Michigan, have alleged violations of Sections 1 and 2 of the Sherman Antitrust Act (15 U.S.C. §§ 1 and 2) by Defendants Northern Michigan Hospitals, a Michigan non-profit corporation and Burns Clinic, a multi-specialty professional corporation, for activities that have arisen in connection with the merger in 1977 of the former Little Traverse Hospital and the former Lockwood-MacDonald Hospital in Petoskey, Michigan. Northern Michigan Hospitals, Inc. is the new entity that replaced the former hospitals. Both Defendants have moved for summary judgment. Although summary judgment procedures were rarely utilized in the past, the rule was changed by *First National Bank v. Cities Service Company*, 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968). When the party opposing the summary judgment

motion has had a substantial opportunity through discovery to obtain facts to support his antitrust allegations and still has failed to do so, summary judgment is appropriate even in an antitrust case. The Sixth Circuit has recognized the propriety of the summary judgment mechanism in appropriate antitrust cases. *Taylor Drug Stores, Inc. v. Associated Dry Goods Corporation,* 560 F.2d 211 (CA 6 1977).

Section 1 of the Sherman Act prohibits any "contract, combination . . . or conspiracy" that constitutes a "restraint of trade or commerce". Section 2 prohibits monopolization, attempts to monopolize, and combinations or conspiracies to monopolize trade or commerce. In view of the broad language of the Act, the courts have recognized that antitrust cases should be decided on a case by case basis. Absent a "naked restraint of trade", a standard of reasonableness has been imposed to judge the lawfulness of the restraint of trade.

> Section 1 to 7 of this title cannot be read to mean what it says without invalidating the entire body of commercial contract law, and it is for this reason that section 1 to 7 of this title has been tempered by the rule of reason. *Havoco of America, Ltd. v. Shell Oil Company,* 626 F.2d 549 (CA 7 1980)

The nature of Plaintiffs' complaints have evolved over the course of discovery with Plaintiffs accepting at the present time both the merger of the two hospital facilities and the consolidation of the emergency room in the former Little Traverse Hospital and the conversion of the Lockwood-MacDonald institution into a physical therapy center and geriatric center. Consequently, these transactions are not at issue in determining whether an antitrust violation has occurred. Indeed, the record supports the conclusion that these decisions were made with the public interest in mind and with the goal of providing better medical care. However, in order to explain the issues remaining in dispute, it is necessary to evaluate the background leading to the merger of the two hospitals.

Prior to the merger in 1977, Little Traverse Hospital had sought approval from the Michigan Department of Public Health for a proposed expansion program. Approval for the expansion was conditioned upon solving the problem of the under-utilization of the Lockwood-MacDonald facility. In fact, members of the Lockwood-MacDonald staff proposed the merger upon learning of Little Traverse Hospital's efforts to expand. The record indicates that Lockwood-MacDonald had been compelled to cut back services in an effort to maintain financial stability. Burns Clinic, a multi-specialty clinic that has operated in the Petoskey area for 50 years and had developed into a regional secondary health center did not participate in the merger negotiations although the majority of the medical staff of Little Traverse Hospital were Burns Clinic physicians, the medical clinic and hospital were physically connected in a building which was owned by Little Traverse Hospital and the two organizations shared some facilities. For example, the emergency room used by Little Traverse Hospital was in the Burns Clinic addition and was staffed by Burns' physicians. Before the merger was approved by the Circuit Court for the County of Emmet, Burns Clinic purchased the building which housed its offices. However, there was a period of time after the merger of the two hospitals into Northern Michigan Hospitals, Inc. when Burns Clinic continued to use its former space for its primary care desk while new accommodations were being constructed. The negotiations for the merger were conducted by the boards of both hospitals. Six members of the board for the new institution were on the former Lockwood-MacDonald staff while six represented the former Little Traverse Hospital staff. Both groups served on the various policy committees of the new institution including that committee which had responsibility for establishing emergency room procedures. Physicians from both groups, including Plaintiffs, have hospital privileges on the NMH staff.

The crux of the issues remaining in dispute since the filing of Plaintiffs' Complaint in May, 1979 centers around the sys-

tem of referring patients who have been seen initially in the emergency room, the policy of referring children under the age of 14 to pediatricians, and the fact that Burns Clinic's primary care desk remained in close proximity to the emergency room for approximately one and one-half years after the merger while its new facilities were being built. Plaintiffs contend that these practices violate the antitrust laws in that they unduly restrain trade and deprive Plaintiffs of the opportunity to attract new patients from those who have been first seen in the emergency room.

While this Court, as a matter of course, will construe the record favorably for the party opposing a Motion for Summary Judgment to discern whether there is a genuine issue of material fact that should be litigated at trial, the purpose of Rule 56 FRCP is to avoid trial when the allegations fail to establish the requisite elements of the cause of action. *Havoco of America, Ltd. v. Shell Oil Company, supra.* Plaintiffs have requested the Court to treat them indulgently when considering these motions for summary judgment. However, it is not the purpose of the summary judgment proceedings for the Court to indulge in idle speculation, and I will not do so.

*First National Bank v. Cities Service Company, supra,* holds:

> To the extent that petitioner's burden of proof argument can be interpreted to suggest that Rule 56(e) should in effect be read out of antitrust cases and permit plaintiffs to get a jury on the basis of allegations in their complaints, coupled with the hope that something can be developed at trial in the way of evidence to support those allegations, we decline to accept it. While we recognize the importance of preserving litigants' rights to a trial on their claims, we are not prepared to extend those rights to the point of requiring that anyone who filed an antitrust action be entitled to a full-dress trial notwithstanding the absence of any significant probative evidence tending to support the complaint.

I do not doubt that the merger of the two hospitals and its concomitant effects have had an unsettling impact upon Plaintiffs and that it may have adversely affected the nature of their medical practices. However, after examining the very extensive record that has been developed in this case, I do not discern any legal basis for finding that a violation of the Sherman Act has occurred.

Sections 1 to 7 of the Sherman Act are not "panaceas for all business affronts that seem to fit nowhere else, and may not be extended beyond its intended scope and use to police the morals of the market place." *Sitkin Smelting and Refining Company, Inc. v. FMC Corporation,* 575 F.2d 440 (CA 3 1978) cert. denied 439 U.S. 866, 99 S.Ct. 191, 58 L.Ed.2d 176 (1978). While there are no "sweeping exemptions" for the learned professions from the antitrust laws, there are some necessary considerations which do not have to be taken into account in other economic areas. *Goldfarb v. Virginia State Bar,* 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1974) notes:

> The fact that a restraint operates upon a profession as distinguished from a business, is, of course, relevant in determining whether that particular restraint violates the Sherman Act. It would be unrealistic to view the practice of professions as interchangeable with other business activities, and automatically to apply to the professions antitrust concepts which originated in other areas. The public service aspect and other features of the professions may require that a particular practice, which could properly be viewed as a violation of the Sherman Act in another context, be treated differently...

While recognizing that there are important public policy aspects to consider here that might justify a restraint of trade, I find that there has not even been a preliminary showing that Defendants have unfairly restrained trade or that they have conspired among themselves or with others to do so. Plaintiffs have rested upon conclusory allegations to illustrate that Defendants

have participated in activities designed to drive Plaintiffs from the practice of primary care medicine. In the face of the documentation to the contrary, I conclude that it would require a leap in logic to hold that there is a reasonable inference from the evidence presented that Defendants have violated the Sherman Act.

■■■ At first Plaintiffs contested the awarding of the exclusive contract to staff the emergency room to Burns Clinic even though Plaintiffs themselves did not formally submit a bid and informally indicated that they wished to continue their former practice of staffing the emergency room on a part time basis while continuing their private practice. It is well settled that there is no violation of the antitrust laws if a monopoly grows or develops as a consequence of a superior product, business acumen or historical accident. *United States v. Grinnell Corporation*, 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1965). Additionally, the antitrust laws permit contracts for exclusive dealings. *Harron v. United Hospital Center, Inc.*, 522 F.2d 1133 (CA 4 1976) cert. denied 424 U.S. 916, 96 S.Ct. 1116, 47 L.Ed.2d 321 (1976). The *Harron* court rejected as "frivolous" an antitrust claim which arose when an exclusive contract was awarded to one radiologist after two hospitals merged. The record here shows that NMH had a legitimate medical and financial purpose to consolidate the emergency rooms, and that the hospital had developed criteria for the emergency room operations based on the desire to provide effective, efficient medical care and not from any malevolent intent toward Plaintiffs. It cannot seriously be argued that full time specialists trained in emergency room techniques cannot provide a superior service to the public than generalists who rotate on a part time basis while conducting their private practice no matter what the other qualifications Plaintiffs may have. An exclusive contract permits more control over standards, personnel and procedures. Considering the potential legal liability that NMH might incur through the operation of its emergency room the desire to have a small group of well trained physicians on a full time basis is understandable.

Recognizing that Northern Michigan Hospitals, Inc. had the right to award an exclusive contract for emergency room services, it follows that the hospital may develop a referral system that operates in the patient's best interests and preserves his freedom of choice. Plaintiffs have intimated that Burns Clinic physicians, who staff the emergency room, favor other Burns Clinic physicians when making referrals and unfairly exclude Plaintiffs. The fact remains that the hospital, not Burns Clinic, sets the policy for making referrals, and that this policy was developed with the consent of independent as well as Burns Clinic physicians. Actually, the source of Plaintiffs' discontent seems to be that the hospital has developed a system of referring patients to specialists. Plaintiffs have not been excluded from the referral lists but as they are general or family practitioners, with the exception of Dr. Smith, an internist, I believe that it is indeed possible that they receive fewer referrals than they formerly did or than they would presently obtain, if the specialist requirement were relaxed. However, the antitrust laws do not require that there be a quota or a specified manner in which patients are allocated to physicians in the community without regard to the independent medical judgment of the referring physician. This is one area of the law that the courts should hesitate to exercise independent authority to regulate in an ad hoc manner as medical practice greatly affects the public interest. In the absence of evidence that the practice of referring patients to specialists is a sham, these policy decisions are better left to the medical rather than to the legal community.

■■■ While Plaintiffs express their unhappiness with the referral system, Defendants have shown that provisions are made to include independent physicians on the roster when "uncommitted patients" are seen in the emergency room. I find that Plaintiffs' unhappiness is a reflection of the inability to maintain the status quo, or the

situation as it was before the merger, rather than with activities by Defendants. Plaintiffs contend that the referral system as stated has not worked equitably in that Plaintiffs were sometimes not notified when their names were up or when their patients requested them. There is no data for the initial period, but the record indicates that the hospital monitored the referral system when notified that there was a problem and found that the errors benefited Plaintiffs as well as adversely affected them. Even some Plaintiffs admit that the errors were fewer than they expected and that the system is presently working. Compared to the number of patients seen, the number of verified errors has been minimal. Additionally, the record indicates that there were times when Plaintiffs were not available when on the call roster. Rather than using this situation as an example of the manner in which the Defendants conspired to harm Plaintiffs, I conclude that it is an indication that the hospital did just the opposite. As there is no requirement that the referrals needed to be made to Plaintiffs at all, given the hospital's right to make exclusive contracts for service, the existence of error in the early stages of developing the program cannot be used to support a violation of the Sherman Act when positive action has been taken to insure Plaintiffs' access to patients. The law holds that unilateral conduct cannot violate Section 1 of the Act. *United States v. Standard Oil*, 316 F.2d 884 (CA 7 1963). Even if Burns Clinic physicians chose to refer patients only to other Burns physicians, this does not, by itself, constitute a violation of the antitrust laws although it may violate Northern Michigan's policies and may be a breach of contract.

Plaintiffs attack NMH's policy of referring children to pediatricians as an example of their illegal practices. The record does not warrant this conclusion. Children had been referred to pediatricians by Burns Clinic pediatricians prior to the merger, although Burns Clinic had modified the procedures on occasion. More importantly, although all the pediatricians in Petoskey are on the Burns Clinic staff, the hospital policy requires referral to *a* pediatrician—not a *Burns Clinic* pediatrician. The hospital indicates that should an independent pediatrician practice in the area, he would be placed on the referral list, as well, in the same manner that other independent specialists are included (e. g. orthopedics).

Plaintiffs have offered no evidence to the contrary to refute Defendants' explanations, nor have they countered the factual record that these policies were not changed as a result of increased competition from the merger, but rather are the continuation of long standing medical planning policies, and procedures. Burns Clinic records indicate that the Clinic had no desire to compete with general or family practitioners and in fact, refrained from establishing a family practice group within the Clinic so as not to compete with independent family practitioners in the area. In light of this, I find that Plaintiffs' antitrust allegations are tenuous at best. Whether it is preferable for a child to be treated by a family practitioner rather than a specialist is, in my opinion, primarily the philosophical decision of the treating physician and the patient's family, not the Court's.

*Selman v. Harvard Medical School*, 494 F.Supp. 603 illustrates the judicial hesitancy to apply legal sanctions to the learned professions when the connection between the activities questioned and the alleged harm to the consuming public are speculative. In determining that Harvard's medical school admission policies did not constitute a violation of the antitrust laws, the court stated:

Courts are properly reluctant to intrude into the academic decision making process except where invidious abuses were indicated. The reluctance to intrude must be that much stronger where as here, the complaint is vague and overreaching. Throughout each and every claim in plaintiff's complaint, he alleged no more than the fact that he is a disappointed applicant who wishes he were able to get his medical education in the United States.

Plaintiffs here have failed to show any more than that they are disappointed in the fact that they do not obtain what they feel to be their "fair share" of the hospital referrals. Given the reasonable premise that pediatricians who have specialized in the unique aspects of children's diseases and illnesses are better equipped to treat children than those who have not, I will not substitute my judgment for that of the hospital to find that this practice results in an illegal restraint of trade.

Plaintiffs refer to the location of Burns primary care desk as another attempt to divert patients from independent physicians. As the courts recognize the right of the hospital to award contracts for exclusive dealing, the hospital could have permitted the desk to remain where it was indefinitely without violating the law. As the matter stands, however, the Burns Clinic primary care desk was relocated within the Burns facility when the addition was constructed. Certainly, this indicates a willingness to treat Plaintiffs fairly and to recognize that independent physicians, including Plaintiffs, desire to practice in the area. From my examinations of the wealth of pleadings, documents and affidavits, I find that Plaintiffs have been affected by policies designed to provide a better, more efficient health care delivery system, and not by a violation of law. Certainly, there has been friction involved, as there often is when major change occurs. That Plaintiffs may well have preferred the health care delivery system as it worked prior to the merger of the two hospitals, however, does not signify that Defendants have engaged in unlawful practices. Professionally established quality norms that are not expressly designed to eliminate competition should be governed by the rule of reason. *National Society of Professional Engineers v. United States*, 435 U.S. 679, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978). Plaintiffs may wish to convince members of the medical profession that the referral system should be changed or that it is equally as desirable to have family practitioners called to treat children when referrals are necessary from the emergency room, but I will not interfere with what I find to be accepted medical practice.

Considering the fact that independent physicians serve on the Northern Michigan Hospitals medical staff, have privileges to treat their private patients in the hospital emergency room, are on the roster for referrals for those patients having no physician in the area when the hospital determines that their area of medicine is needed, and in view of the long established history of Burns Clinic as a center for practicing specialized secondary care medicine, any inference that Defendants monopolized, attempted to monopolize, or conspired to monopolize primary medical care in the Petoskey area is highly speculative. Plaintiffs have had ample opportunity to develop factual support for their theories and have failed to do so.

*Aviation Specialties, Inc. v. United Technologies Corporation*, 568 F.2d 1186 (CA 5 1978) applies to the case at issue. When a party has failed to produce significant probative evidence tending to show the existence of an illegal conspiracy, when there has been ample opportunity to conduct discovery, and still the inference of no conspiracy is more probable than the Plaintiffs asserted inference of conspiracy, summary judgment is proper. A full-dress trial is not required in the absence of significant probative evidence tending to support the Complaint.

■ Plaintiffs correctly point out that the medical profession is not exempt from antitrust regulation as the Court well recognizes. Plaintiffs further argue that *National Gerimedical Hospital and Gerontology Center v. Blue Cross of Kansas City and Blue Cross Association*, —— U.S. ——, 101 S.Ct. 2415, 69 L.Ed.2d 89 (1981) should be dispositive here. The Supreme Court held that there was no indication that Congress intended private insurance providers to enforce advisory health care planning decisions by refusing to contract with a hospital which did not conform to these advisory plans, and held that there is no antitrust exemption to all health care providers for actions taken in response to planning recommendations. That is not the issue before

this Court, however. In the case at bar, the issue is not whether an insurance carrier will pay for medical services delivered in one hospital but not in another, but rather the more substantive issue of what constitutes appropriate medical care and who makes that determination.

I find that Plaintiffs have not supported the broad charges alleged in the Complaint and that Defendants have produced both business and medical justification for their actions. There has been no outright refusal to deal with Plaintiffs here. Rather, in the light of changing medical, social and economic needs, the manner of dealing does not take the form that Plaintiffs prefer. Under these circumstances, trial of the case is unwarranted as Plaintiffs' allegations fail to provide any basis for relief. Accordingly, I grant both Defendants' Motions for Summary Judgment.[1]

---

1. As this Opinion is not premised upon economic issues but rather upon the right of Northern Michigan Hospitals, Inc. to establish standards for the medical care it provides, and as the Court is cognizant of the close relationship that existed between Burns Clinic and the former Little Traverse Hospital, there is no purpose at this point to grant Plaintiffs' Motion to Compel Production of Financial and Medical Records from Defendant Burns Clinic. The Court recognizes that other hospitals and other medical communities may not be so inclined, but holds, that given the fact that this preference for specialization has a solid grounding in medical theory, the determination of the proper balance between generalists and specialists is for the medical community to resolve. The Court further notes that the purpose of the Sherman Antitrust Act is to protect the consuming public. In this instance, the ultimate concern must be the welfare of the patient. The Court will not impose arbitrary restraints upon the hospital's discretion in this area absent indication of abuse.